# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 95-CA-00413-SCT

*LEONNA PENROD*

*v.*

*CRAIG REISELT*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/95 |
| TRIAL JUDGE: | HON. ANTHONY THOMAS FARESE |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | NANCY M. BALL |
| ATTORNEY FOR APPELLEE: | T. SWAYZE ALFORD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 2/13/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SULLIVAN, P.J., McRAE AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

Leonna Penrod Moore and Craig Reiselt were married on April 2, 1988. During the marriage, a minor child, Chad E. Reiselt, was born on February 6, 1989, in the State of Washington. In August of 1991, the parties separated as a result of marital difficulties. Soon after the separation, Craig filed a complaint for divorce. Leonna joined in the divorce action and the parties agreed to a Permanent Parenting Plan. In this plan Craig was to serve as the primary custodial parent of Chad, and Leonna was granted reasonable rights of visitation.

After the parties separated, Leonna moved to Marshall County, Mississippi, to live with her family. On April 16, 1992, Brett K. Reiselt was born in Oxford, Mississippi. The Permanent Parenting Plan was not revised to include custody or support for Brett. The Final Decree of Divorce was entered in Washington on May 5, 1992, absent any mention or provision for the custody of Brett.

Craig filed suit against Leonna on or about March 1, 1994, seeking custody of Brett. A paternity test

established that he was the biological father. However, Leonna continued to hinder Craig's efforts to exercise visitation with Brett, as she had done since his birth. A temporary order regarding visitation rights of Craig with Brett was entered on January 31, 1995.

On March 9, 1995, the lower court heard testimony presented by both parties. At the conclusion of the hearing, the chancellor rendered an oral opinion in open court and subsequently entered a judgment. The opinion and judgment granted custody of Brett to Craig with visitation rights to Leonna.

Aggrieved of the chancellor's decision, Leonna filed her appeal and raises the following issue:

### I. WHETHER THE CHANCELLOR ERRED IN GRANTING CUSTODY OF THE MINOR CHILD AS A RESULT OF MISAPPLYING THE *ALBRIGHT* FACTORS.

### STATEMENT OF THE FACTS

Since the entry of the decree of divorce in the State of Washington, both parties have remarried. At the time of the custody hearing, Craig resided in Oak Harbor, Washington, and had lived there for over six years. He was employed by the United States Navy as a Second Class Petty officer and was in electronic repair supervising twenty individuals. Chad Reiselt, the oldest son of Craig and Leonna, lives with Craig and his wife, Monica.

Craig's shift at the Navy is from 11:00 p.m. to 7:00 a.m. Working that shift allows Craig to see Chad in the morning when Chad awakes to begin his day. It also allows Craig to pick Chad up after school and spend the rest of the day with him before Craig has to go back to work. Chad is enrolled at Oak Harbor Christian School, where he has been introduced to computers at an early age, and continues that exposure at home with his family's personal computer.

Leonna did not inform Craig she was pregnant with Brett until about six weeks after they had separated. At that time, Leonna lived with her parents in Holly Springs, Mississippi. There was limited contact between Craig and Leonna during her pregnancy.

Following Brett's birth, the parties met on several occasions to exchange Chad for visitation. Each time Leonna failed to bring Brett with her to allow Craig visitation. The first occasion was in October, 1992, when Leonna came to Washington to pick up Chad. In September, 1993, Leonna sent her father to Washington to pick up Chad for visitation. Next, in December, 1993, Leonna brought Chad to Craig in Memphis, Tennessee, and did not bring Brett with her. In March, 1994, Leonna traveled to Washington to pick up Chad and again did not bring Brett.

In May, 1994, the parties litigated the custody of Chad in Washington state with custody being awarded to Craig and Leonna receiving visitation. Leonna had visitation with Chad immediately following the custody hearing and ending in mid-July of 1994. Craig testified that Leonna has not had any visitation with Chad since that time. Craig began his visitation with Brett in February of 1995. He conceded that Brett was well-mannered on these visits and Leonna had done a good job with him.

Craig's mother, Sharon Reiselt mailed gift packages to both boys during the time they were staying with Leonna in Holly Springs. The packages were returned by Leonna's mother unopened. Photocopies of the returned envelopes were entered into evidence at trial. Leonna testified that her

mother had done everything short of tying Brett to a chair to prevent him from seeing Craig or his parents.

After the divorce from Craig, Leonna married Greg Moore. They have two children--Aiden Penrod, eighteen months at the time of the trial and Austin Gregory, two months at the time of the trial. At the time of the trial, Greg, Leonna, Aiden, Austin, and Brett, lived in a two bedroom mobile home on property owned by Leonna's father.

Greg has a child from a previous marriage for whom he pays child support; however, at the time of the trial, he was unemployed. Also at the time of the trial, Leonna was not employed. Her last employment was in July of 1994.

Greg and Leonna had been without a phone for over a year prior to trial. They were unable to obtain one due to a previously unpaid bill. The couple used the phone at Greg's parents who live next door. However, this privilege was taken away when the couple did not pay a $13 long distance charge. Leonna did not exercise her telephonic visitation with Chad citing as reasons that she did not have access to a phone and it depressed her to talk to him. Leonna testified that she would rather Chad and Brett be raised together. She explained that due to the fact she was not given custody of Chad and the young age of Brett it would be best for Brett to remain with her. She believed it would do more emotional harm to tear him away from her, other family bonds, and his environment. Leonna testified that she believed the bond between brothers was more important than the bond between a mother and a son.

Although Leonna testified that she would prefer to send Brett to a private school if awarded custody, she admits that she does not know if she will be able to afford the tuition. Craig had started Chad in preschool in Washington, but Leonna did not continue the preschool during her visitation periods with Chad in Mississippi. Leonna had no objections to Craig's parenting of Chad. She described him as a good father to Chad, and would be the same to Brett. In fact, she stated that the potential for a good relationship was already there. Leonna testified to her mother's strong ill feelings toward Craig and his parents. Leonna's mother had returned packages mailed by Sharon to Brett and Chad. Leonna testified that her mother discouraged any relationship between Brett and Craig and Craig's parents. Further, Leonna testified that her mother had referred to Craig as an "s.o.b." and Brett had learned to refer to his father as an "s.o.b." Leonna's mother, Jackie Penrod, admitted that she has used the term "son of a bitch" in Brett's presence when referring to Craig. However, Jackie did state that she thought Craig was a good father to Chad. Leonna testified that she had tried to counter the discussions by her family referring to Craig as an "s.o.b." by telling Brett that Craig was a "good guy who took care of Chad for her."

Leonna's father, Kenneth Penrod, Sr., told Brett, as well as others in the community, his father did not want him. He went further and told Brett his father did not love him. Kenneth stated he believed Craig did not care for Brett because Craig wanted Leonna to have an abortion and because he made no effort to come see Brett after his birth.

At the conclusion of the custody hearing, the chancellor awarded custody of Brett to Craig. Leonna Penrod Moore perfected her appeal from the final judgment entered on March 24, 1995, to this Court.

## I. WHETHER THE CHANCELLOR ERRED IN GRANTING CUSTODY OF THE MINOR CHILD AS A RESULT OF MISAPPLYING THE *ALBRIGHT* FACTORS.

### A. Standard of Review

The scope of review for the issue of child custody is quite limited, as stated in ***Chamblee v. Chamblee***, 637 So. 2d 850, 860 (Miss. 1994), where the Court held:

> This court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. In other words, "on appeal (we are) required to respect findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." This is particularly true "in the areas of divorce and child support."

***Chamblee***, 637 So. 2d at 860; ***Crow v. Crow***, 622 So. 2d 1226, 1228 (Miss. 1993); ***Morrow v. Morrow***, 591 So. 2d 829, 832-33 (Miss. 1991); ***Clark v. Myrick***, 523 So. 2d 79, 80 (Miss. 1988); ***Culbreath v. Johnson***, 427 So. 2d 705, 707 (Miss. 1983). (internal citations omitted).

### B. Application of the *Albright* factors.

This Court in ***Albright v. Albright***, 437 So. 2d 1003 (Miss. 1983), enumerated several useful guidelines to be applied in child custody cases. In ***Albright***, the Court determined that the "polestar consideration in child custody cases is the best interest and welfare of the child." ***Id.*** at 1005. The factors to weigh in determining the child's best interest are as follows:

> Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
>
> Marital fault should not be used as a sanction in custody awards. Relative financial situation is not controlling since the duty to support is independent of the right to custody. Differences in religion, personal values, and lifestyle should not be the sole basis for custody decisions.

***Albright***, 437 So. 2d at 1005.

The chancellor found that it was in Brett's best interest to be placed in the custody of Craig. Leonna erroneously categorizes this case as a modification of child custody. Leonna would have this Court apply the two part test for modification as stated in its earlier holding of ***Phillips v. Phillips***, 555 So. 2d 698, 700 (Miss. 1989).[1] This is a case involving an initial determination of custody, not a modification. Prior to the case sub judice, custody of Brett had never been legally adjudicated;

therefore, a determination of custody was made for the first time by the chancellor. The correct legal standard was simply the best interest of the child as enumerated by this Court in *Albright*, 437 So. 2d at 1005.

Leonna claims that the chancellor committed reversible error by granting custody of Brett to Craig. She claims the chancellor disregarded the factors in *Albright* dealing with financial support. "Relative financial situation is not controlling since the duty to support is independent of the right to custody." *Id.* Leonna contends that the chancellor reasoned that the mother's bad credit, inadequate living space, her lack of employment and the fact that her present husband currently pays $250 in child support justified this factor being weighed against her.

Leonna states that the chancellor considered her financial status and lifestyle, along with a negative opinion of her parents' attitude and lifestyle, as the sole basis for awarding custody to Craig. She cites to *Albright* where the Court held, "[d]ifferences in religion, personal value and lifestyle should not be the sole basis for custody decisions." *Albright*, 437 So. 2d at 1005. According to Leonna, the chancellor held the actions of her parents against her, even though she clearly disagreed with her mother's efforts to thwart Brett's relationship with his father.

This Court in *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994), reiterated its earlier holding in *Smith v. Todd*, 464 So. 2d 1155 (Miss. 1985), stating that the list of factors in *Albright* was not to be exhaustive, but a beginning point. A chancellor can correctly consider the stability of the parties' respective homes , the personal qualities of the parties, and the separation of the children. *Sellers*, 638 So. 2d at 485. This Court has previously stated "a common sense recognition of the ordinary facts of life, that in the absence of some unusual and compelling circumstances dictating otherwise, it is not in the best interest of the children to be separated." *Sparkman v. Sparkman*, 441 So. 2d 1361, 1363 (Miss. 1983).

In his oral opinion the chancellor restated Leonna's testimony that the children should not be separated, but she admitted to maybe being selfish in thinking Brett should live with her. We find that the chancellor was correct in applying the rationales from *Albright* and *Sparkman* to determine what was in the best interest of the child, and no one else, by keeping the children together. There were no "unusual or compelling circumstances dictating it to be in the best interest of the children to be separated." *Sparkman*, 441 So. 2d at 1363.

"That which will promote the best interest of the children is the criterion by which an award of custody should be made and the problem of what is the best interest of a child must be solved by a consideration of the relative fitness and ability of each parent to discharge the duties of nurture, maintenance, education, and training." *Hodge v. Hodge*, 186 So. 2d 748, 750 (Miss. 1966).

This Court has stated its intent to not only look at the present situation, but look to the future. "In making this determination (best interest of the child), consideration must be given not only to the present need of the child, but also what will serve his best interest during the ensuing years until his majority." *Thompson v. Foster*, 244 So. 2d 395, 396 (Miss. 1971).

Leonna adamantly contends that the chancellor did not correctly apply the facts of the case sub judice to the factors listed in *Albright*. Thus, his decision to award custody to the father was erroneous and not in the best interest of the child. However, the chancellor in his oral opinion on the record clearly

goes step by step through the factors set forth in *Albright*. The following is the pertinent portion of that opinion:

Now, let's look at these--I think that there's about 15 of them--let's look at these factors. Not all of them may apply in some cases.

**The age of the child:** [W]e know that Brett is about three years of age, he is a young boy.

**Continuity of care prior to separation:** Well, prior to this day the mother has had continuing care since his birth, so she wins that factor.

**The best parenting skills:** I would say that from what I've heard, the father has better parenting skills than the mother. The mother is dominated by her mother. The mother seems somewhat passive when it comes between her and the mother. I would say that factor favors the father.

**The employment factors and the responsibilities of that employment:** The father is in a much better employment situation than the mother. He has a viable job skill that he can use in civilian life with computers-electronic devices. He even has a computer at home, and he's teaching Chad how to use it. Chad can use part of it by himself.

**The responsibilities of that employment:** The father is a military man. He has employment supervisory responsibilities. He testified about the number of men that are under his charge. The mother, on the other hand, is not employed. She once worked at Jitney Jungle. She's looking for a job. She may go back to Jitney Jungle. She quit because of her pregnancy with her last child, which is certainly understandable. She also would like to work at one of the gambling establishments, and I'm not sure if that's good for her or anybody else, for that matter.

**The age of the parent:** They are both very young. I believe he's 27 and she's 28, he's a year or two younger than her, I believe.

**The health factors, including the health of the child:** --According to what I've heard the child is healthy. The physical health of the parents--this is a wash out--they are both in good health. There's no question about the health of the father. He's in the military. If he's in bad shape they will discharge him.

**The mental health of the parents:** There's nothing really wrong with either one of them mentally.

**The emotional ties between the parent and the child:** There is no question that this mother is emotionally tied to this child--the father is also. But I think the father's emotion has some reality, stability and understanding. The mother's situation--bad credit, no job, a husband who is not working and who must pay $250.00 per month to his former wife for the support of his son who lives with his mother; inadequate living space in a house trailer for two adults and three or more children.

**Next is the moral fitness of the parents:** The mother appeared to be honest and truthful. Some of her testimony was against her mother, who she described as trying to destroy the

relationship between the boys and their father. My observation of Leonna is that down deep within herself, she would agree that Brett would be better off living with his father and brother, but she did not want to admit it. She concluded her testimony by patting herself on her chest and said, "I may be selfish." Her opinion as to what was in the best interest of Brett appeared to the Court to be what she wanted, not what was best for Brett.

**As to moral fitness of the home, environment factor:** [A]lthough Brett has an extended family in and around Marshall County, Mississippi, he also has an extended family at his father's legal domicile. His father is in the Navy and his domicile is where the naval authorities send him. His legal domicile is in Ohio where he was raised. He has a father, mother, brother and other relatives in that general area. There was not one iota of testimony detrimental to the home environment of the paternal grandparents, or the home environment of Brett's father. Leonna's situation is different. Her parents are no help to her at all. Their environment in Brett's life is harmful rather than helpful. Leonna's home environment is not conducive to Brett's best interest either. Her poverty occasioned by her unemployment as well as the unemployment of her husband and his inability to meet the support requirements of his child born during his former marriage is a financial strain in Leonna's life. Although poverty is not, in and of itself, a ground for modification of child custody, yet when considered with other *Albright* factors this Court concludes that between his two parents, Brett would be better off living with his father.

**The past record of the child's behavior in school:** The child is not in school at the present time.

**The home and community factor:** Brett is a very active little boy. He's been running around in this courtroom. I could hear him from time to time, but he's not old enough to be influenced by the community.

**The stability of the home environment:** The father's home environment is better than the mother's home environment.

**The preference of the child:** The child is not twelve years of age yet, so there can be no preference expressed.

The Court has had the opportunity to observe the parties and their witnesses. From the totality of all facts and circumstances it appears to the Court that the Plaintiff is more objective, reasonable and stable in his lifestyle, earning capacity, and capability to more fully understand and perform his responsibilities as a parent. He has the support of a working wife. Further, he has the support of his parents who likewise appear to be very much concerned about the best interest and welfare of their grandson. The Plaintiff has already made provision for financing the cost of his son's college education. He has viable job skills as previously stated.

The Defendant does not have a job nor does she have a solid prospect of employment. Although she appears to have the moral support of her husband, he does not have a job. He has a court imposed child support obligation which will be difficult to perform without employment. The Defendant has no income to support herself or her children. She has the support of her parents. However, her parents support is misplaced and is detrimental to the best interest of Brett. Teaching the child to believe and call his father a son of a bitch is certainly not conducive

to the child's best interest. Further, the maternal grandmother is hostile to the Plaintiff as indicated by sending back gift packages. She acted without the consent or knowledge of the Defendant. The Defendant stated that her mother intended to do whatever she could to destroy Chad and Brett's relationship with their father and paternal grandparents. The Defendant's father, Kenneth Penrod, Sr., was brainwashing the boys against their father by telling them their father did not love them and also telling others that their father did not want them.

## CONCLUSION

As discussed above, the standard of review of a chancellor's decision is limited on appeal. This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Chamblee*, 637 So. 2d at 860. This Court holds the chancellor was correct in the decision he rendered based on the testimony and evidence presented to him. Therefore, the chancellor's decision is affirmed.

**JUDGMENT IS AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, SMITH AND MILLS, JJ., CONCUR.**

1. In *Phillips*, this Court recognized two prerequisites for a modification of child custody:

1) a material change in circumstances must be established after the entry of the final decree of divorce which adversely affects the child.

2) if a material, adverse change is established, it must be proven by the preponderance of the evidence that the best interest of the child requires a change of custody.